[L. A. No. 7166. In Bank.—December 19, 1922.]

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA Respondent.

[L. A. No. 7165. In Bank.—December 19, 1922.]

LOS ANGELES & SALT LAKE RAILROAD COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[S. F. No. 10111. In Bank.—December 19, 1922.]

SOUTHERN PACIFIC COMPANY (a Corporation), et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[1] Carriers — Interstate and Intrastate Business — Control by Congress.—Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule.

---

1. Effect of federal control on order of state commission as to depots and stations, notes, 4 A. L. R. 1718, 1719; 10 A. L. R. 969.

[2] ID. — UNION TERMINAL DEPOT FACILITIES — RAILROADS LARGELY
ENGAGED IN INTERSTATE COMMERCE—JURISDICTION—EFFECT OF
AMENDMENT OF INTERSTATE COMMERCE ACT.—Under the Esch-
Cummings Act of February 28, 1920, amending the Interstate
Commerce Commission Act, full power and authority over the
matter of union terminal depot facilities of the railroads which
are largely engaged in interstate commerce, has been vested in
the Interstate Commerce Commission, and by virtue thereof the
Railroad Commission of California has been divested of the
power, authority and jurisdiction over that subject.

PROCEEDINGS in Certiorari to review an order of the
Railroad Commission providing for the elimination of grade
crossings and the establishment of a union terminal depot.
Order annulled.

The facts are stated in the opinion of the court.

E. W. Camp, Paul Burks, M. W. Reed, C. W. Durbrow,
A. S. Halstead, Fred E. Pettit, Jr., and Wm. F. Herrin for
Petitioners.

Hugh Gordon and William W. Clary for Respondent.

Jess E. Stephens, Milton Bryan and Max Thelen for City
of Los Angeles.

Seward A. Simons for Central Development Association of
Los Angeles.

Marshall Stimson for Civic Center Association of Los An-
geles.

James H. Howard for City of Pasadena.

William Hazlett for City of South Pasadena.

F. W. Henshaw and Corbet & Selby, of Counsel.

THE COURT.—These three proceedings were instituted
before this court for the purpose of having reviewed and an-
nulled an order of the Railroad Commission, made in certain

2. On power to require establishment of union station, note,
L. R. A. 1915D, 98.

proceedings before that body of the following nature: In 1916 the Civic Center Association of the city of Los Angeles filed a complaint before the commission against the Southern Pacific Company, the Atchison, Topeka & Santa Fe Company and the Los Angeles and Salt Lake Company, praying for an order providing for the elimination of certain grade crossings in said city and for the establishment of a union depot therein. Two other civic organizations of said city presently filed similar petitions asking for like orders. Four petitions were also filed from adjacent municipalities asking for the elimination of grade crossings and a reorganization of the track systems of these several railroad corporations. In addition to these the Southern Pacific Company and the Los Angeles & Salt Lake Railroad Company united in an application to the commission for the establishment of a union terminal depot as to themselves upon a certain site and also for the elimination of certain grade crossings as an incident to the location of said terminal. These eight proceedings were consolidated by the stipulation of all of the parties and heard as one proceeding before the commission; which, after a prolonged and exhaustive consideration of the issues involved, made its order for the elimination of certain grade crossings and for the establishment of a union terminal depot for all of said railroads, to be located within a certain defined area. The present proceedings were instituted to review this order. Upon the filing of the return to the writ this court made an order consolidating these three proceedings for the purpose of hearing and decision.

This court has already had before it the question as to the power of the Railroad Commission to provide for the elimination of grade crossings as to all of the present petitioners, in the case of *Civic Center Assn., etc.,* v. *Railroad Commission,* 175 Cal. 441 [166 Pac. 351], in which case it was held as between itself and the city of Los Angeles the Railroad Commission possessed this power and was directed to exercise it. In proceeding to exercise said power pursuant to such direction the Railroad Commission, in the course of hearing upon the consolidated proceeding before it, concluded that as an indispensable element in the elimination of the proposed grade crossings it was necessary to provide for a union terminal depot for all three railroads, with such changes and extensions of the railroad lines of each as would be necessary

for the utilization of said depot by each and all of these railroads; and it therefore assumed and exercised the power so to do, whereupon the present proceedings were instituted by the petitioners herein.

The main contention of the petitioners is that the Railroad Commission has no jurisdiction to make any order or orders relative to the establishment and construction of a union depot for part or all of the petitioners herein, for the reason that such power has been taken from the state and its agency and has been vested in the Interstate Commerce Commission by virtue of the amendment to the Interstate Commerce Commission Act made by Congress on February 28, 1920. This contention, standing as it does upon the threshold of the subject under review will be first considered.

. The act of Congress above referred to, and commonly known as the Esch-Cummings Act, is twofold in its purposes and effects. Its first object was to accomplish the termination of the control of the railroads taken over by the federal government during the progress of the war by virtue of the "Federal Control Act," approved March 21, 1918 [41 Stats. 456], and by the later amendments to said act. The second of its main objects was to amend the act of Congress commonly known as the "Interstate Commerce Act," originally approved February 24, 1887, with its later amendments. It is with this latter purpose that we are concerned in this proceeding. An inspection of this portion of the said amendatory act discloses that it embodies a large number of amendments to the Interstate Commerce Act as it existed at the date of said amendment, and that many of these are of the most important and far-reaching character. The supreme court of the United States in the recent case of *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. R. Co.,* 257 U. S. 563 [66 L. Ed. 371, 42 Sup. Ct. Rep. 232], in reciting the provisions and commenting upon the scope of said amendatory act, says:

"It is manifest from this very condensed recital that the act made a new departure. Theretofore the control which Congress through the Interstate Commerce Commission exercised was primarily for the purpose of preventing injustice by unreasonable or discriminatory rates against persons and localities, and the only provisions of the law that inured to the benefit of the carriers were the requirement that the rates

should be reasonable in the sense of furnishing an adequate compensation for the particular service rendered and the abolition of rebates.   The new measure imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States. This is expressly declared in section 15a to be one of the purposes of the bill.''

Turning to the provisions of said amendatory act which embody these radical extensions of the powers and duties of the Interstate Commerce Commission, we find that section 15a thereof [41 Stats. 488, sec. 422], to which the foregoing decision expressly refers, greatly enlarges the powers of the commission with regard to the regulation of not only interstate but also of intrastate rates, whenever the control and regulation of the latter are necessary to the exercise of the affirmative powers of Congress in developing interstate commerce.   The decision above referred to expressly deals with that phase of the question and upholds the powers with which the Interstate Commerce Commission is invested under said section of the amendatory act.   Turning to the provision of said act amending the first paragraph of section 5 of the Interstate Commerce Act we find in subdivisions 4 and 5 thereof the following express statement of the scope and purposes of said act:

''(4) The Commission shall as soon as practicable prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems.   In the division of such railways into such systems under such plan, competition shall be preserved as fully as possible and wherever practicable, the existing routes and channels of trade and commerce shall be maintained.   Subject to the foregoing requirements, the several systems shall be so arranged that the cost of transportation as between competitive systems and as related to the values of the properties through which the service is rendered shall be the same, so far as practicable, so that these systems can employ uniform rates in the movement of competitive traffic and under efficient management earn substantially the same rate of return upon the value of their respective railway properties.''

''(5) When the Commission has agreed upon a tentative plan, it shall give the same due publicity and upon reasonable

notice, including notice to the Governor of each State, shall hear all persons who may file or present objections thereto. The Commission is authorized to prescribe a procedure for such hearings and to fix a time for bringing them to a close. After the hearings are at an end, the Commission shall adopt a plan for such consolidation and publish the same; but it may at any time thereafter, upon its own motion or upon application, reopen the subject for such changes or modifications as in its judgment will promote the public interest. The consolidations herein provided for shall be in harmony with such plan." (41 Stats., pt. 1, p. 481.)

In the interpretation to be given to the further provisions of said act, having more particular reference to the immediate question before us, the foregoing provisions of said act expressive of its enlarged scope and purposes are to be borne in mind. Having these in view, the following provisions of the act are found to bear directly upon the powers and functions with which the Interstate Commerce Commission have been invested, with relation to any and all extensions and changes in the lines, tracks and facilities of railroads engaged wholly or largely in interstate commerce. The term "railroad" as used in said act is defined by subdivision 3 of section 1 of the Interstate Commerce Act as thus amended [41 Stats. 474, sec. 400], as including "all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards and grounds, used or necessary in the transportation or delivery of any such property." The term "car service" as employed in said amendatory act is defined in subdivision 10 of section 1 of the Interstate Commerce Act, as thus amended, to include the use, control, supply, movement, distribution, exchange, interchange and return of locomotives, cars and other vehicles used in the transportation of property, including special types of equipment and the supply of trains by any carrier by railroad, subject to this act. Subdivision 15 of said section 1 of the said original act as thus amended provides, "whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any

section of the country, the Commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: . . . (c) to require such joint or common use of terminals, including main-line tracks or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable." Subdivision 18 of said section 1 of said original act as thus amended further provides: "(18) After ninety days after this paragraph takes effect no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first shall have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." (41 Stats., p. 477.) Subdivision 21 of said section 1 of said original act as thus amended in part provides: "(21) The Commission may, after hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier by railroad subject to this Act, party to such proceeding, to provide itself with safe and adequate facilities for performing as a common carrier its car service as that term is used in this Act, and to extend its line or lines: Provided, That no such authorization or order shall be made unless the Commission finds, as to such extension, that it is reasonably required in

the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public." Subdivision 22 of said section 1 of said original act as thus amended provides: "(22) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation." Subdivisions 3 and 4 of section 3 of the original act as thus amended provides: "(3) All carriers, engaged in the transportation of passengers or property, subject to the provisions of this Act, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper." "(4) If the Commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings. Such compensation shall be paid or adequately secured before the enjoyment of the use may be commenced. If under this paragraph the use of such terminal facilities of any carrier is required to be given to another carrier or other carriers, and the carrier whose terminal facilities are required to be so used is not satisfied with the terms fixed for such use, or if the amount of compensation so fixed is not duly and promptly paid, the

carrier whose terminal facilities have thus been required to be given to another carrier or other carriers shall be entitled to recover, by suit or action against such other carrier or carriers, proper damages for any injuries sustained by it as the result of compliance with such requirement, or just compensation for such use, or both, as the case may be.'' The foregoing excerpts from among the many provisions of said amendatory act would seem to fully justify the statement of Chief Justice Taft, above quoted from the decision of the supreme court of the United States, as to the radical departure effected by the said amendment to the Interstate Commerce Act in the direction of placing the entire control over the rates, properties, tracks, terminals and facilities of the railroads engaged in interstate commerce in and under the jurisdiction of the Interstate Commerce Commission. That Congress had the full power so to do, is established by a long line of judicial decisions reaching back to the leading case of *Gibbons* v. *Ogden,* 9 Wheat. 1 [6 L. Ed. 23, see, also, Rose's U. S. Notes], wherein Chief Justice Marshall carved out the pathway for all later decisions by the declaration that the power of Congress to regulate commerce among the several states is supreme and plenary; ''is complete in itself, may be exercised to its utmost extent and acknowledges no limitations other than are prescribed in the Constitution.'' It is needless to cite in detail the almost numberless cases in which the doctrine enunciated in that early decision has been reiterated and applied, but among the more recent cases involving its application are the *Minnesota Rate Cases,* 230 U. S. 352 [Ann. Cas. 1916A, 18, 48 L. R. A. (N. S.) 1151, 57 L. Ed. 1511, 33 Sup. Ct. Rep. 729, see, also, Rose's U. S. Notes], wherein the supreme court of the United States, Mr. Justice Hughes delivering the opinion (p. 432), gives very full and exhaustive consideration to the question as to the scope and effect of the federal legislation upon the subject of interstate commerce, with special reference to its limitations upon the legislative or administrative power of the states to deal with any matters relating to interstate commerce coming within the terms and scope of such federal legislation. In the course of that decision Mr. Justice Hughes makes use of the following significant language in considering certain phases of those cases analogous to those presented in the case at bar:

"The interblending of operations in the conduct of interstate and local business by interstate carriers is strongly pressed upon our attention. It is urged that the same right-of-way, terminals, rails, bridges, and stations are provided for both classes of traffic; that the proportion of each sort of business varies from year to year and, indeed, from day to day; that no division of the plant, no apportionment of it between interstate and local traffic, can be made to-day, which will hold to-morrow; that terminals, facilities and connections in one State aid the carrier's entire business and are an element of value with respect to the whole property and the business in other States; that securities are issued against the entire line of the carrier and cannot be divided by States; that tariffs should be made with a view to all the traffic of the road and should be fair as between through and short-haul business; and that, in substance, no regulation of rates can be just, which does not take into consideration the whole field of the carrier's operations, irrespective of state lines. The force of these contentions is emphasized in these cases, and in others of like nature, by the extreme difficulty and intricacy of the calculations which must be made in the effort to establish a segregation of intrastate business for the purpose of determining the return to which the carrier is properly entitled therefrom.

"But these considerations are for the practical judgment of Congress in determining the extent of the regulation necessary under existing conditions of transportation to conserve and promote the interests of interstate commerce."

[1] Numerous other cases may be cited from both federal and state courts sustaining the rule that wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority and the state, and not the nation, would be supreme within the national field. (*Houston & Texas Ry.* v. *United States*, 234 U. S. 342, 351 [58 L. Ed. 1341, 34 Sup. Ct. Rep. 833, see, also, Rose's U. S. Notes], and cases cited.) The case of *People ex rel. New York Central R. R. Co.* v. *Public Service Commission*, 233 N. Y. 113 [135 N. E. 195], is a case which nearly approaches identity with the case at bar.

It involves the question as to whether under the public service commission law of the state of New York the public service commission of that state had power to make an order directing two railroad companies, engaged in interstate and intrastate commerce within that state, to reconstruct a switch or track connecting their lines and install other tracks and facilities so as to furnish adequate and convenient interchange of freight between said railroads. Upon appeal from an order dismissing a writ of review instituted by the relator for the purpose of testing the power of the public service commission to make said order, it was held by said court that the state commission had no jurisdiction to make such order in view of the provisions of the act of Congress of 1920 amending the interstate commerce law. The court said:

"The Transportation Act of 1920, section 402, amended the second paragraph of section 3 of the Interstate Commerce Act to provide: 'All carriers, engaged in the transportation of passengers or property, subject to the provisions of this Act, shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper.'

"A violation of that provision of the act of Congress authorizes a complaint by any interested party to the interstate commerce commission, and after a hearing before that commission to such relief as the facts warrant. The interstate commerce commission is clothed with authority by the section quoted to compel carriers to afford reasonable and proper facilities for the interchange of traffic between their respective lines. The order made by the public service commission commands relator and the Lehigh Valley to make such track connections between their roads as shall be necessary or proper to establish and furnish adequate and convenient interchange of freight between said roads. To sustain the order of the public service commission in the instant case would necessarily establish that the two several com-

missions mentioned were clothed with jurisdiction to grant the relief sought and require us to ignore the well-established principle of law that the Congress having delegated to the interstate commerce commission power to deal with the subject-matter of this proceeding, an exercise of like power by the state is thereby superseded." Citing *Erie R. R. Co.* v. *People of the State of New York,* 233 U. S. 671 [Ann. Cas. 1915D, 138, 52 L. R. A. (N. S.) 266, 58 L. Ed. 1149, 34 Sup. Ct. Rep. 756, see, also, Rose's U. S. Notes] ; *Chicago, R. I. & P. Ry. Co.* v. *Hardwick Elevator Co.,* 226 U. S. 426 [46 L. R. A. (N. S.) 203, 57 L. Ed. 284, 33 Sup. Ct. Rep. 174].

The respondents herein, however, contend that the Railroad Commission was empowered to make and enforce the order sought to be annulled in this proceeding under the authority of the case of *Missouri etc.* v. *Larrabee,* 211 U. S. 612 [53 L. Ed. 352, 29 Sup. Ct. Rep. 214, see, also, Rose's U. S. Notes]. That case held that the mere delegation by Congress to the Interstate Commerce Commission of power to act in a given matter did not prevent such action by the state authorities unless the commission had taken action in the particular matter involved, quoting therefrom the following:

"Until then the authority of the state in merely incidental matters remains undisturbed. In other words, the mere grant by Congress to the Commission of certain national powers in respect to interstate commerce does not of itself, and in the absence of action by the Commission, interfere with the authority of the state to make those regulations conducive to the welfare and convenience of its citizens."

In the matter of the extension of railroad facilities and in the abandonment of other railroad facilities, including terminals, not only is the commission empowered to act upon the subject, but Congress has expressly prohibited the railroad companies from acting without the consent of the Interstate Commerce Commission (see sec. 1, subd. 18, *supra*). Subdivision 20 of that section (41 Stats., p. 478), construed in connection with subdivisions 19 and 21, authorizes the commission to issue a certificate for the extension or abandonment of portions of railway lines and for the issuance of a certificate authorizing such work to be done or a

190 Cal.—15

line to be abandoned (subd. 18, 19, 20, 21), and with reference to such certificate provides as follows:

"From and after issuance of such certificate, and not before, the carrier by railroad may, *without securing approval other than such certificate,* comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both.'' (Italics ours.)

[2] It is clear from the foregoing that Congress has not only vested jurisdiction in the Interstate Commerce Commission over the question of the extension of terminal facilities, such as contemplated by the order of the Railroad Commission in the case at bar, but has also prohibited the railroads from making such improvements without the consent of the Interstate Commerce Commission. This being true, Congress has fully occupied the field of regulation of such matters and the power of the state commission has thereby been terminated.

An examination of the case of *Missouri etc.* v. *Larrabee, supra,* further shows that it was decided in 1909, several years prior to the passage of the Amendatory Act of 1920, and at a time prior to any attempt on the part of Congress to invest the Interstate Commerce Commission with jurisdiction over the matter of changes or extensions in interstate railroad lines.

The respondents also urge the contention that since this court has decided in the case of *Civic Center Association* v. *Railroad Commission, supra,* that the Railroad Commission of California had jurisdiction to make and enforce

orders providing for the elimination of those certain grade crossings involved, in part, in the proceedings before the Railroad Commission, and since the said commission had found and held in said proceedings that the establishment of a union terminal depot was an indispensable element in accomplishing the elimination of said grade crossings, the commission had the power to include in its order for the elimination of such grade crossings the creation of such union terminal depot. There is no merit in this contention, for the reason, very aptly set forth in the extract above quoted from the decision of the New York court of appeals in the case of *People etc.* v. *Public Service Commission, supra.* It is also without merit for the further reason that, notwithstanding the views expressed by the Railroad Commission in its findings and conclusions in the proceeding herein presented for review, we can perceive no indispensable relation between the elimination of grade crossings and the establishment of union depot facilities, nor can we see any insurmountable difficulty why jurisdiction over the matter of eliminating grade crossings may not be exercised in a proper case consistently, and it may be concurrently, with the exercise of the authority which is vested by the act of Congress of 1920 in the Interstate Commerce Commission over the subject of union terminal depot facilities.

From the foregoing excerpts from the act of Congress of 1920, amendatory of the interstate commerce law, and from the authorities above cited, we arrive at the conclusion that full power and authority over the matter of union terminal depot facilities of the railroads which are largely engaged in interstate commerce, and who are the petitioners herein, has been vested in the Interstate Commerce Commission under the terms of said Amendatory Act of 1920, and that by virtue thereof the Railroad Commission of California, one of the respondents herein, has been divested of the power, authority and jurisdiction over that subject, sought by it to be exercised in the several proceedings before it and by the order presented for review herein. This disposition of the primary inquiry involved in these proceedings renders unnecessary a discussion of the several subsidiary questions presented for our consideration by the briefs of counsel herein.

The application is granted and the order of the Railroad Commission annulled.

Lennon, J., Waste, J., Wilbur, J., Shurtleff, J., Sloane, J., and Lawlor, J., concurred.

SHAW, C. J., Concurring.—I concur in the foregoing opinion on the grounds therein stated.

I wish to say, however, in addition, that the conclusion that the Railroad Commission has no power to order the terminal depot in question constructed can also be reached by resort to the principle laid down in *Atchison, T. & S. F. Ry. Co.* v. *Railroad Com.*, 173 Cal. 577 [2 A. L. R. 975, 160 Pac. 828]. That decision establishes the principle that railroads are private property which are devoted to public use, and that the state has no power to order the railroad company, without its consent, to establish a new line of railroad for the benefit of the public. The scheme here embraced in the order of the Railroad Commission contemplates the expenditure of a very large sum of money by the railroad companies in the construction of a new terminal depot for their joint use in a place where there is no existing depot and no tracks leading thereto. Entirely new tracks will have to be built to reach the new depot, and the land on which it is to be erected and on which the track is to be built will have to be acquired by the said companies, or by some subsidiary company in which they are all interested, and vast sums of money must be used in constructing the buildings and tracks required for the union depot.

If this be true it is equally beyond the power of the Interstate Commerce Commission to make the order. To require the railroad companies to construct this depot and the tracks necessary therefor is equivalent to ordering them to dedicate new property to a public use. I know of no power which will justify the state in commanding a railroad company to thus acquire and dedicate property to a public use.

Rehearing denied.

All the Justices concurred.