## UNITED STATES ex rel. CITY OF LOS ANGELES v. INTERSTATE COMMERCE COMMISSION.*

Court of Appeals of District of Columbia.
Submitted January 8, 1929. Decided February 25, 1929.

No. 4863.

Edwin C. Blanchard, of Washington, D. C., and Max Thelen, of San Francisco, Cal., for appellant.

Daniel W. Knowlton, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. The city of Los Angeles, Cal., a municipal corporation, filed a petition for mandamus in the Supreme Court of the District of Columbia to compel defendant, the Interstate Commerce Commission, to make an order requiring the Southern Pacific, the Atchison, Topeka & Santa Fé, and the Los Angeles & Salt Lake Railroad Companies to construct, maintain, and operate, a union passenger station in the city of Los Angeles, at a point near what is known as the Plaza.

It appears that in 1921 the Railroad Commission of California, in a proceeding before it, ordered the carriers named to file plans for the erection of a union station at the point above designated in the city of Los Angeles, and in a subsequent order required the carriers to secure sufficient land for the construction of the station and terminal, to submit plans therefor, and, upon approval by the commission, to proceed with the construction. The carriers appealed from the decision to the Supreme Court of California. Los Angeles & S. L. R. Co. v. Railroad Commission, 190 Cal. 214, 211 P. 460. The court reversed the order on the ground that the Transportation Act of 1920, 41 Stat. 456, had vested full authority over union depot facilities of interstate carriers by railroads in the Interstate Commerce Commission, divesting the state commission of jurisdiction in the premises. From this decision the state commission carried the case to the Supreme Court of the United States.

While the case was there pending, the city of Los Angeles filed a complaint with the Interstate Commerce Commission praying the Commission to require the defendant carriers to construct and operate the union passenger station in question. During the pendency of this case before the Commission, the Supreme Court rendered its opinion in Railroad Com. of Cal. v. Southern Pac. Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713, hereafter for convenience referred to as the Los Angeles Case, in which the judgment of the Supreme Court of California (190 Cal.

*Judgment reversed 50 S Ct. 53, 74 L. Ed. —.

214, 211 P. 460) was affirmed, the court holding, in substance, however, that defendant carriers could not be required to provide a union station and extend their terminal tracks until the Interstate Commerce Commission had acted under paragraphs 18 to 21 of section 402 of the Transportation Act (49 USCA § 1 (18–21). ·

The Commission then issued its report in the proceeding instituted by the City of Los Angeles, City of Los Angeles v. Los Angeles & S. L. R. Co., 100 I. C. C. 421, holding that it was powerless "to require carriers to construct union passenger stations under conditions such as are here present." It, however, made findings in accordance with its interpretation of the decision of the Supreme Court, to the effect that public convenience and necessity required such extensions and abandonments of lines and service and joint use of terminal tracks as would be necessary in the establishment and operation of a union passenger station at the point designated, and that the expense would not·impair the ability of the roads to perform their respective duties to the public. The Commission, however, refused to issue certificates as provided in the Transportation Act, but retained jurisdiction of the case, reserving the right to alter its findings in event that the plan evolved by the carriers or the state commission for the establishment of a union station might be materially different from that "here considered to be in the public interest."

The state commission reopened the case, and on further hearing rendered a decision, with findings substantially identical with those made by the Interstate Commerce Commission, and in addition found that public convenience and necessity required the defendant carriers to construct a union passenger station at the point designated, with the terminal facilities incidental thereto, which in its opinion could be done at a cost of $10,-000,000. The state commission thereupon made an order requiring defendant carriers to carry out its findings when the Interstate Commerce Commission should promulgate an order authorizing the construction, extensions, and abandonments, as directed by the state commission.

The city of Los Angeles and the state commission thereupon filed with the Interstate Commerce Commission petitions asking the Commission to issue certificates in accordance with the findings theretofore made by it, and to order said carriers to construct and thereafter operate the union passenger station in compliance with the plan announced by the state commission. The car-

riers filed answers opposing the relief sought. Evidence was taken, and the Interstate Commerce Commission, on May 8, 1928, rendered its report and order affirming the findings made in its earlier report with the finding that the report of the state commission is sufficiently supported in the record, and it accordingly issued certificates in conformity with said findings. Los Angeles Passenger Terminal Case, 142 I. C. C. 489. The Commission, however, adhered to the decision reached in the earlier case to the effect that it was not empowered to require the construction of a union passenger station, and denied the application in this particular.

It was this decision which brought about the present suit, and, from the decision of the court below dismissing the petition, this appeal is prosecuted.

■ We think the Interstate Commerce Commission was in error in holding that it is without power under the Transportation Act to require the carriers in question to construct a union station. The purpose in the mind of Congress in vesting in the Commission the extensive control over interstate railways, set forth in the Transportation Act, is expressed in Dayton-Goose Creek Railway Co. v. United States, 263 U. S. 456, 478, 44 S. Ct. 169, 172 (68 L. Ed. 388, 33 A. L. R. 472), where the court said: "The new Act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged."

This broad supervisory power, it is urged, does not extend to the requirement that an interstate carrier or system of carriers may be required by the Commission to install an interstate union station; but running throughout the act are provisions which authorize the Commission to impose most drastic limitations on a carrier's control and use of its property in order to secure the convenience

and welfare of the shipping and traveling public in interstate commerce. It specifically imposes upon the Commission the power and duty, when required by public convenience and necessity, to convert the passenger and freight station of one interstate carrier into a union station or depot. The inconsistency of granting this power without the analogous power of requiring a number of carriers converging at a given point to erect, for the convenience of the traveling public and the carriers themselves, an interstate union station is pointed out in the Los Angeles Case, at page 344 of 264 U. S. (44 S. Ct. 378), where the court said: "This would be giving power to the Interstate Commerce Commission to provide for a small and contracted union station of interstate carriers, limited to the terminals of one carrier, and would leave the larger and more important union stations of interstate carriers to the control of state commissions. We think, however, that means of control over installation of such new union stations for interstate carriers is given to the Interstate Commerce Commission in amended paragraphs (18 to 21) of section 402."

Under this construction of paragraphs 18 to 21, it is clear that an interstate carrier is not permitted to extend its line of railroad, or to construct a new line, or acquire a line of road or extension thereof, or engage in transportation over such line or lines, until it has procured from the Interstate Commerce Commission a certificate that public convenience requires it. Neither can a carrier abandon all or any portion of its line without a similar certificate. As was further said in the Los Angeles Case: "Such a certificate is, we think, necessary in the construction of a new interstate union station, which involves a substantial and expensive extension of the main tracks or lines of interstate carriers who theretofore have maintained separate terminals. * * * Until the Interstate Commerce Commission shall have acted under paragraphs 18 to 21 of section 402 of the Transportation Act, the respondent railways cannot be required to provide a new interstate union station and to extend their main tracks thereto as ordered by the State Railroad Commission."

Following this suggestion, the Interstate Commerce Commission issued the following certificate: "It is hereby certified, that the present and future public convenience and necessity (1) require the construction by the Los Angeles & Salt Lake Railroad Company, the Southern Pacific Company, and the Atchison, Topeka & Santa Fé Railway Company, of extensions of their respective main lines of railroad in the City of Los Angeles, California, so as to reach and serve a union passenger station and terminal which they may construct in the Plaza district, pursuant to the order of the Railroad Commission of the State of California to that effect; (2) require the construction of the necessary extensions of their main lines, and permit the abandonment of such other portions of their main lines, as may be necessary to provide for the rearrangement of passenger and freight routes incidental to the convenient and proper operation of such union passenger station and terminal; (3) permit the abandonment and operation of all passenger and freight train service, except incidental freight-train and freight-switching service, on the main line of the Southern Pacific on Alameda Street from College Street to east Fifteenth Street, inclusive, in the City of Los Angeles, California; and (4) require the use by any defendant steam carriers of so much of the terminal main-line track or tracks of any of the other defendant steam carriers in the City of Los Angeles, California, as may be incidental, and necessary or convenient, to the proper operation of such union passenger station and terminal."

It will be observed that the Commission, in its certificate as to necessity and convenience, omits any certification to the fact "that the expense involved therein will not impair the ability of the carrier to perform its duty to the public." This, however, we think is affirmatively implied in the certification as to necessity and convenience. Especially, in view of the findings of fact found by the Commission in its earlier decision, 100 I. C. C. 421, 459, 460, to the effect that the public convenience and necessity requires "the extension by defendants of their respective main lines of steam railroad in the City of Los Angeles, Calif., so as to reach and properly serve any union passenger station and terminal" at the point designated. Following these findings of fact, the Commission further found as follows: "That the extensions referred to in the preceding paragraph are reasonably required in the interest of the public convenience and necessity, and that the expense involved therein will not impair the ability of defendants to perform their respective duties to the public." In view of this express finding of fact by the Commission, the court would certainly not be justified in failing to determine the fundamental question of jurisdiction here involved merely upon the failure of the Commission to make an express certification on this point.

The point at most is not jurisdictional, but incidental to the exercise of jurisdiction by the Commission. The question before us is not one involving direction of the Commission as to how it shall act, but merely the requirement that it take jurisdiction of the matter of establishing proper terminals and a union station at the point designated and proceed therein as required by law. Interstate Commerce Com. v. U. S. ex rel. Humbolt Steamship Co., 224 U. S. 474, 32 S. Ct. 556, 56 L. Ed. 849.

We think the act clearly manifests the intention of Congress to give the Interstate Commerce Commission jurisdiction over the rearranging and extension of terminals and the establishment of union depots by converging interstate railroad lines, and to limit the jurisdiction of state commissions to matters purely intrastate and such exercise of police power as may be essential over interstate lines within the state.

Paragraph 22 of section 402 (49 USCA § 1 (22) provides as follows: "The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or all street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

The court in the Los Angeles Case at page 345 of 264 U. S. (44 S. Ct. 379) interpreted the above limitation upon the power of the Interstate Commerce Commission as follows: "This is a palpable distinction between the main tracks of an interstate carrier, and its spur, industrial, switching or side tracks, and shows the legislative intention to retain any substantial change in the main tracks within the control of the Interstate Commerce Commission. It may well be that a mere relocation of a main track of an interstate carrier which does not involve a real addition to, or abandonment of, main tracks and terminals, or a substantial change in destination, does not come within the paragraphs 18 to 21. One might, too, readily conceive of railroad crossings, or connections of interstate carriers in which the exercise by a state commission of the power to direct the construction of merely local union stations or terminals without extensions of main tracks and substantial capital outlay should be regarded as an ordinary exercise of the police power of the state for the public convenience and would not trench upon the power and supervision of the Interstate Commerce Commis-

sion in securing proper regulation of an interchange of interstate traffic or passengers."

We come now to the conceded facts as set forth in paragraph XVIII of the petition. The railroad terminal properties and trackage which would be used in carrying out the union depot plan, including the entire trackage along the Los Angeles river and nearly all of the land on which the union station is to be erected, are now owned by the three carriers here involved. The small portion of land still in private ownership is needed only for a proper approach to the main depot and for properly completing the project as planned. This land could be acquired, of course, by the carriers, either by purchase or by eminent domain under direction of the appropriate public authority.

It thus appears that the whole project is such that under the act it has been removed from the jurisdiction of the state commission and placed within the jurisdiction of the Interstate Commerce Commission. If, in carrying out the project, necessity arises for the state to exercise its police power in the matter of protecting street crossings, etc., it would be merely incidental to the general scheme, co-operative with and not hostile to the jurisdiction of the Interstate Commerce Commission.

The broad power conferred upon the Interstate Commerce Commission is set forth in paragraphs 3 and 4 of section 405 of the act (49 USCA § 3 (3, 4). Paragraph 4 empowers the Commission to regulate the terminal facilities of converging carriers to the extent of requiring an interchange of trackage by the different lines to facilitate the better operation and handling of freight and passengers.

Paragraph 3 provides as follows: "All carriers, engaged in the transportation of passengers or property, subject to the provisions of this Act, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, or charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper." This section we think vests the Interstate Commerce Commission with almost unlimited power in the matter of establishing terminals and union stations for the proper interchange of traffic between the converging interstate

railroad lines. The term "reasonable, proper, and equal facilities" is broad and comprehensive enough to include not only trackage but adequate station facilities.

██ The carriers, through counsel, challenge the constitutional power of Congress to vest the Interstate Commerce Commission with jurisdiction to order the construction and operation of a union passenger station as prayed for by the city of Los Angeles. This contention is based on decisions of the courts to the effect that the Commission may not order the carriers to perform a different service than that which they have undertaken to render. It is well established that, while public authority under legislative sanction and in the exercise of police power may require railroad companies to construct and operate union passenger stations, the facts upon which such orders are based must be reasonable.

██ In view of the facts in the instant case, the contention that the carriers cannot be required to extend their tracks to reach the proposed union station is without merit. The situation here disclosed is most reasonable and well within the jurisdiction of administrative authority. The three interstate carriers involved all enter the city of Los Angeles from the north, and pass under what is known as the North Broadway viaduct over the Los Angeles river. The main lines of the Southern Pacific and Santa Fé extend along the west bank of the river, and the main line of the Salt Lake Road runs along the east bank. The Santa Fé's track runs directly across the site of the proposed terminal, the Southern Pacific track also extends across the site along Alameda Street, and the Salt Lake's branch line track extends directly across the river from the site. It will be observed that to reach the terminal, instead of any material extension of trackage, it means merely a convenient readjustment of existing tracks.

Prior to the enactment of the Transportation Act of 1920, the states in many instances, either by Constitution or statute, had vested jurisdiction in their Railroad Commissions to compel the construction of union stations. Railroad Commission of Alabama v. Alabama Northern Railway Co., 182 Ala. 357, 62 So.

749; Railroad Commission of Alabama v. Alabama Great Southern Railway Co., 185 Ala. 354, 64 So. 13, L. R. A. 1915D, 98; Mayor of Worcester v. Norwich & Worcester R. R. Co., 109 Mass. 103; Dewey v. Atlantic Coast Line, 142 N. C. 392, 55 S. E. 292; State v. St. Louis Southwestern Ry. Co. (Tex. Civ. App.) 165 S. W. 491. These state decisions go to the extent of upholding orders requiring a carrier to acquire additional property through eminent domain, the abandonment of existing passenger stations, or the acquiring of the right to use the property of a rival railroad.

It was in effect held by the Supreme Court of California in the present controversy (190 Cal. 214, 211 P. 460) that the power vested in the State Railroad Commission of that state had passed by the Transportation Act of 1920 to the Interstate Commerce Commission. In this instance the State Railroad Commission derived its jurisdiction through a provision of the Constitution of the state of California. It was held, nevertheless, that Congress, in the exercise of its constitutional power to regulate interstate commerce, could divest the State Railroad Commission of its jurisdiction and vest it in the Interstate Commerce Commission. This ruling was affirmed in the Los Angeles Case.

The procedure adopted by the city of Los Angeles in applying to the Interstate Commerce Commission for an order requiring the carriers to establish the union station in question was approved in the concluding words of the opinion in the Los Angeles Case, where the court said: "We were advised by statements at the bar that, after the California Supreme Court handed down its decision in this case, the City of Los Angeles filed a petition with the Interstate Commerce Commission, asking for an order to provide, maintain, and use a union station, that a hearing followed, and that, pending the decision in this court, the matter is held under consideration. For the reasons given, we think the course taken by the City of Los Angeles was the correct one."

The judgment is reversed, with costs, and the cause is remanded for further proceedings, not inconsistent with this opinion.