11204

SHEALY *ET AL.* RAILROAD COMMISSION v. SOUTHERN
RAILWAY Co.

(120 S. E., 561)

Railroads—Commission Authorized to Require Railroad to Construct Shed.—The State Railroad Commission *held* to have authority, under the police power of the State, to order a railroad to construct a shed for the traveling public at a station at which trains carrying both interstate and intrastate passengers stop.

Original application for writ of mandamus by Frank W. Shealy and others composing the South Carolina Railroad Commission against Southern Railway Co. Writ granted.

*Messrs. S. M. Wolfe, Attorney General, John M. Daniel, Assistant Attorney General, W. C. Wolfe* and *John E. Benton* for petitioners; Mr. Daniels, cites: *Railroad Commission had authority to order construction of sheds to promote convenience, security and accommodation of the public:* 1 Civil Code, 1912, Sec. 3147; 31 Stat., 1086; 71 S. C., 130; 74 S. C., 80. *Mandamus is proper:* 1 Civil Code, 1912, Sec. 3208; 71 S. C., 133; 74 S. C., 85; 200 U. S., 561.

*Messrs. Frank G. Tompkins, S. R. Prince,* for respondent. Mr. Tompkins cites: *Transportation Act* 1920 *construed:* 257 U. S., 563; 42 Sup. Ct. Rep., 232. *Development of relation between national and state law:* 211 Pac., 460; 233 N. Y., 113; 224 U. S., 194; 116 U. S., 334.

January 2, 1924.

The opinion of the Court *en banc* was delivered by Mr. Chief Justice Gary.

The Railroad Commission of South Carolina made application to this Court, in the exercise of its original jurisdiction, for a writ of mandamus requiring the Southern Railway Company, to construct certain sheds at Blackville, S. C., which the Railroad Commission of this State had ordered the Southern Railway Company to erect, in accordance with the specifications described in said order.

The railroad company refused to comply with that order —hence this petition for a writ of mandamus.

On hearing the application, it was adjudged by the, Supreme Court that the petition be dismissed. Thereupon the Railroad Commission filed a petition for a rehearing upon certain grounds therein set forth.

The Circuit Judges were then called to the assistance of the Supreme Court. A referee was appointed to take testimony and report his findings of fact upon the following questions: (1) What would be the cost of erecting the sheds described in the petition herein? (2) Is it necessary to erect the sheds, in order to protect the health of the. traveling public from the inclemency of the weather at the station in question? (3) Is it necessary for the convenience of the traveling public that the said sheds should be erected? (4) What is the relative use of the trains passing said station by the interstate and intrastate passengers?

The testimony has been taken, the report made, and they are now on file.

The main question in the case is whether the Railroad Commission of South Carolina had authority, under the police power of the State, to order the construction of the sheds.

The general principles applicable to the question under consideration are thus clearly stated in 5 R. C. L., 102 *et seq.:*

"In the exercise of the police power, the states or their municipalities may enact statutes and ordinances to protect the public health, the public morals, the public safety, and

the public convenience; that is, they may adopt any legislation or regulation for any of those purposes and relative to interstate or foreign commerce, provided such laws or ordinances are local in their character and affect interstate commerce incidentally only, and especially is such a power favorably recognized when it is so exercised as to be an aid to such commerce. It has even been said by the Supreme Court of the United States that the proper exercise of the police power is not only a right of a State, but that a state is under an obligation to establish such regulations as are necessary or reasonable for the welfare and safety of all domiciled within its limits. A statute, however, purporting to have been enacted to protect the public health, the public morals, the public safety, or to serve the public convenience, must have some real or substantial relation to those objects, and cannot, in any event, be allowed to operate so as directly to burden or trammel interstate or foreign commerce, or to trench upon those subjects which are national in their character and which are within the exclusive power of Congress to regulate. A presumption may and should be indulged that a statute was enacted in good faith for any of the purposes for which this police power can be exercised, but its operation and validity must be determined by its natural and reasonable effect. The exercise of the State's police power must yield when it comes in conflict with an affirmative exercise by Congress of its power to regulate commerce, but, in the application of this principle of supremacy of an Act of Congress in a case where the State law is but an exercise of this reserved power, the repugnance or conflict should be direct and positive, so that the two Acts cannot be reconciled or consistently stand together. The reference at this place to the police power of the States must necessarily be general and merely suggestive, as the discussion throughout the article hereafter of the different subjects of regulation has relation largely to the exercise of this power with reference thereto, and to the power of the States to

legislate with respect to their purely local concerns incidentally affecting commerce."

In 6 R. C. L., 182 *et seq*. it is further said:

"The police power is an attribute of sovereignty, possessed by every sovereign State, and is a necessary attribute, of every civilized government. It is inherent in the States of the American Union and is not a grant derived from or under any written constitution. It has been said that the very existence of government depends on it, as well as the security of social order, the life and health of the citizen, and the enjoyment of private and social life and the beneficial use of property. It has been described as the most essential, at times the most insistent, and always one of the least limitable, of the powers of government. * * *

"It has also been stated that the police power is but another name for that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the State, and that it comprises that portion of the sovereignty of the State which was not surrendered by the terms of the Federal Constitution to the central government. * * *

"The police power to a large extent rests on the maxim *sic utere tuo ut alienum non laedas,* and it is the function of the government by which this maxim is enforced. One of the objects of government is to impose that degree of restraint on individual action which is required for the reasonable enjoyment of all in their respective rights. It has been said that nearly every problem involved in the police power finds its solution in the application of the principle embodied in this maxim, that every one must so use his own property as not to injure the rights of others, and that this principle should be observed in the exercise of the police power. * * *

"It is very broad and comprehensive and is liberally understood and applied. * * *

"It is a fundamental principle of constitutional law that in matters relating to the police power each successive Legislature is of equal authority, and that a legislative body cannot part with its right to exercise such power, but that it inherently has authority to use the police power again and again, as often as the public interests may require. It has been said that the governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted nor the use of property be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury. These principles are embodied in the familiar rule that the State cannot barter away the right to use the police power, and cannot by any contract divest itself of the power to provide for acknowledged objects of legislation falling within the domain of the police power. Accordingly the Legislature cannot surrender or limit such powers either by affirmative action or by inaction, or abridge them by any grant, contract, or delegation whatsoever. The discretion of the Legislature cannot be parted with any more than the power itself. * * *

"The police power under the American Constitutional system has been left to the States. It has always belonged to them and was not surrendered by them to the General Government, nor directly restrained by the Constitution of the United States. Each State has the power, therefore to regulate the relative rights and duties of all persons, individuals and corporations, within its jurisdiction, for the public convenience and the public good. The only limit to its exercise in the enactment of law is that they shall not prove repugnant to the provisions of the State or National Constitutions. Congress has no general power to enact police regulations operative within the territorial limits of a State, and it cannot take this power from the States or attempt any supervision over the regulations of the States established under this power. * * *

"A police regulation, obviously intended as such, and not operating unreasonably beyond the occasions of its enactment, is not rendered invalid by the fact that it may affect incidentally the exercise of some right guaranteed by the Constitution; as, for example, it is said that the exercise of the police power is not subject to restraint by constitutional provisions designed for the general protection of rights of individual life, liberty, and property. While there are no precise limits to the police power, it is not, however, without its limitations, since it may not unreasonably invade private rights, or violate those rights which are guaranteed under either Federal or State Constitutions. * * *

"The Fourteenth Amendment to the Constitution of the United States does not interfere with the proper exercise of the police power of the several States. Accordingly the provisions of this Amendment prohibiting any State from depriving any person of life, liberty, or property without due process of law do not operate as a limitation upon the police power of the State to pass and enforce such laws as in its judgment, will inure to the health, morals, and general welfare of the people. * * *"

While the Esch-Cummins bill was under discussion, Congressman McClintock offered the following amendment:

"Provided, further, that the Commission is hereby given authority to require a carrier to maintain his present arrangement or to make new arrangements, relative to the joint use of depots, upon such terms as shall be found by the Commission to be just and reasonable. No carrier shall be allowed to discontinue the use of a depot in connection with another carrier until proper application has been made to the Commission."

Chairman Esch, in speaking to the amendment, used these words:

"The matter which the gentleman from Oklahoma seeks to reach by his amendment lies almost wholly within the police power of the several States. There have been

amendments offered to this bill seeking to preserve such police powers. The committee in framing the bill has sought not to encroach upon such powers. The matters of depots and joint use of depots is practically in the jurisdiction of the State Commissions, and all but one of the States have such Commissions. In such small matters the detail should be left within the jurisdiction of the State authorities, who know the situation, know the conditions, and know how best to meet the needs. There is, however, a provision in this bill providing for the joint use of terminals."

Mr. Justice Cothran, in concluding his opinion, uses these words:

"The effect of the Transportation Act of 1920 [U. S. Comp. St. Ann. Supp., 1923, § 1007¼ *et seq.*] is to limit the power of the States over interstate commerce to an exceedingly circumscribed sphere. They have control of purely internal affairs, but that control, in so far as it affects interstate carriers, must be exercised in a manner that does not project the will of the particular State into other States of the Union."

It will be observed that he concedes that the Act of 1920 limits but does not take entire control over interstate commerce. Furthermore, it cannot reasonably be contended that the erection of a couple of sheds at Blackville, S. C., would project the will of this State into other States of the Union.

In Fuller on Interstate Commerce, 100, it is said:

"The Act to regulate commerce extends to and includes all terminal facilities which, though entirely within a State, are used wholly or partially in the operation of interstate commerce.

"The Supreme Court has held that Congress has not so taken over the whole question of terminals, switching, tracks, sidings, etc., of interstate railroads, as to invalidate all State regulations relative to the interchange of traffic."

The syllabus states correctly the doctrine announced in *St. Louis-San Francisco Ry. Co. et al. v. Public Service Commission of Mo.,* 43 Sup. Ct., 380; 67 L. Ed.—.

In delivering the opinion of the Court Mr. Justice McKenna said:

"The railway company conducts an interstate railroad between Kansas City, Mo., and Birmingham, Ala., passing through the City of Mountain Grove, Mo.

"Upon the petition of a volunteer organization of the City, the Public Service Commission of Missouri ordered the railway company to (1) provide for the stopping of its southbound train No. 105 at Mountain Grove for the purpose of taking on and discharging passengers at that point; (2) provide for the stopping of north bound train No. 106 at the City, on flag or signal, for the purpose of letting off passengers who board the train at points south of the Arkansas State line, and for the purpose of taking on passengers holding tickets for points beyond Springfield, Mo.; (3) the order to be in full force and effect on and after the 16th day of June, 1919.

"The order was attacked by the railway company on the ground that it was 'in violation of Section 8 of Article 1 of the Constitution of the United States, in that it constituted a regulation of, interference with, and burden upon interstate commerce.' The order, however, was successively affirmed by the Circuit Court having jurisdiction, and by the Supreme Court of the State. To the judgment of the latter this writ of error is directed.

"The Supreme Court expressed the question to be 'whether or not the order of the Commission as affirmed by the Circuit Court imposes an undue burden on interstate commerce.' The Court considered the question a 'vital one to be determined under the facts in this case.'

"*Chicago, Burlington & Quincy Railroad Co. v. Railroad Commission of Wisconsin,* 237 U. S., 220; 35 Sup. Ct., 560; 59 L. Ed., 926, was adduced for the conclusion that a

State may require of a railroad adequate local facilities, even to the stoppage of interstate trains or the rearrangement of their schedules, whether done directly by the Legislature or through an administrative body.

"It was decided, however, that it was for this Court to determine 'the fact of local facilities,' that determination being necessary to our power to consider whether the regulation of the State affected interstate commerce to an illegal extent.

"The primary principle is that, although interstate commerce is outside of regulation by a State, there may be instances in which a State, in the exercise of a necessary power, may affect that commerce. There is, however, no inevitable test of the instances; the facts in each must be considered. In *Gladson v. Minnesota,* 166 U. S., 427; 17 Sup. Ct., 41 L. Ed., 1064, it was decided that a State regulation requiring all regular passenger trains running wholly within the State to stop at stations at all county seats long enough to take on and discharge passengers invaded no constitutional right of the railroad, nor was it an infringement of interstate commerce because it was made applicable to interstate connecting trains or trains transporting mails of the United States.

"In *Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Illinois,* 177 U. S., 514; 20 Sup. Ct., 722; 44 L. Ed., 868, a statute requiring all regular passenger trains to stop a sufficient length of time at county seats to receive and let off passengers was held invalid as an interference with interstate commerce, there being local trains sufficient for the local business. The case reviewed prior cases, including *Gladson v. Minnesota,* and declared that while there is no regulatory power in a State over interstate commerce in a proper case, the State may exercise its power to secure local facilities, although some interference with interstate commerce may result.

3—S. C. R., 127.

"To the like effect is *Mississippi Railroad Commission v. Illinois Central Railroad Co.,* 203 U. S., 335; 27 Sup. Ct., 90; 51 L. Ed., 209; and *Atlantic Coast Line Railroad Co. v. Wharton et al.,* 207 U. S., 328; 28 Sup. Ct., 121; 52 L. Ed., 230. In this case, indeed in all of the cases, the admonitory caution is expressed: 'That any exercise of State authority, in whatever form manifested, which directly regulates interstate commerce, is repugnant to the interstate commerce clause of the Constitution.'

"There is concession, however, to the requisition of reasonable facilities; necessarily, therefore, the fact of such facilities at, or their absence from, Mountain Grove must be inquired into."

The testimony taken by the special referee fully sustains the action of the Railroad Commission in ordering the sheds in question to be erected, but his findings of fact are not supported by the testimony.

It is therefore adjudged that the petitioners are entitled to the writ of mandamus for which they prayed.

MESSRS. FEATHERSTONE, SEASE, DENNIS, RICE, BOWMAN, JOHNSON, MEMMINGER, TOWNSEND, DEVORE, SHIPP and MARION, Circuit Judges, concur.

MR. JUSTICE FRASER (concurring): I at first concurred with Mr. Justice Cothran, and still think that as matters then stood, his opinion is not only correct, but strong, clear and unanswerable. The question of police power, however, changes conditions, and renders the case at least doubtful.

As the case now stands, with the issue of police powers involved, I think our State Courts should sustain the action of the State Railroad Commission, and leave it to the Supreme Court of the United States to determine the question. Unless it is clear that the State authorities have exceeded their authority, the doubt should be solved in favor of State authority by a State Court.

For these reasons I withdraw my concurrence in the opinion of Mr. Justice Cothran, and concur in the result in the opinion of the Chief Justice.

MR. MEMMINGER, Circuit Judge (concurring): The opinion of Mr. Justice Cothran holds that "if it were not for the Act of Congress known as the Transportation Act of 1920, there would be ample authority in the decisions of this Court to sustain the Commission's order."

The opinion does not discuss the constitutional question which would appear to forbid such a construction as has been thereafter made in the opinion upon said Act. As a result of the views expressed in the opinion, even the "Jim Crow Law" of the State (Civ. Code, 1922, §§ 4944-4948) could not be enforced.

However, I think it is not necessary to resort to the complex constitutional question referred to, as to whether Congress has the power to interdict the order of the State Railroad Commission, involved in this case, which, after all, will be found to be but a pure regulatory police power, because it will be shown that Congress had no intent to destroy the previously existing power of State authorities to make such orders.

The true questions falling out for decision, are: Whether it was the intent of the Transportation Act to interdict such orders of State authorities; and (if so): Whether Congress has the constitutional power to interdict such orders?

The questions are best arranged in this order, because, as stated, if the conclusion is reached that Congress had no such intent, there would be no occasion to consider the difficult constitutional question referred to.

A careful analysis of the Act, will show that it was not the intention of Congress to interdict the orders of State authorities requiring reasonable expenditures for the purpose of providing for intrastate transportation.

The most important new provision (as was said by the Chief Justice) in the Wisconsin Passenger Fare Case, 257

U. S., 563; 42 Sup. Ct. 232; 66 L. Ed., 371; 22 A. L. R., 1086, was Section 15a (U. S. Comp. St. Ann. Supp., 1923, § 8583a), which made it the duty of the Federal Commission so to adjust rates that the carriers in the country, as a whole, or within such rate groups as the Commission might divide the country into, should earn upon their aggregate value, as found by the Commission, a return as nearly as may be "equal to a percentage of such value found to be fair by the Commission."

It appears to me that this Section 15a, and certain accounting provisions in the Act, have caused Mr. Justice Cothran to reach the conclusion that the order requiring certain expenditures at Blackville is invalid, as it would increase value; but there are many other provisions in the Act quite inconsistent with any construction of the Act holding that it was the intent of Congress to place "the entire control over the rates, properties, track, terminals, and the facilities of the railroad engaged in interstate commerce, in and under the jurisdiction of the Interstate Commerce Commission," to quote language from *A., T. & S. F. Ry. v. R. R. Commission* (Cal. Sup.), 211 Pac., 460, which has been given great weight in the said opinion; and in this connection it should be noted the California decision is under appeal.

The United State Supreme Court, since the Act, has not treated the Act as abrogating State power. In *State of Texas v. East Texas R. R.,* 258 U. S., 204; 42 Sup. Ct., 281; 66 L. Ed., 566, we find:

"As a whole these Acts show that what is intended is to regulate interstate and foreign commerce and to affect intrastate commerce only as that may be incidental to the effective regulation and protection of commerce of the other class. They contain many manifestations of a continuing purpose to refrain from any regulation of intrastate commerce, save such as is involved in the rightful exertion of

the power of Congress over interstate and foreign commerce."

In the Wisconsin Rate Case, 257 U. S., 563; 42 Sup. Ct. 232; 66 L. Ed., 371; 22 A. L. R., 1086, where an order of the Federal Commission holding certain State rates discriminatory was upheld, Chief Justice Taft said:

"It is said that our conclusion gives the [Federal] Commission unified control of interstate and intrastate commerce. It is only unified to the extent of maintaining efficient regulation of interstate commerce under the paramount power of Congress. It does not involve general regulation of intrastate commerce."

Recurring to the opinion of Mr. Justice Cothran, immediately following the statement referred to, that the Commission has the authority to make the order in question if it were not for the Transportation Act, the opinion states that the Act "placed the entire control over rates, properties, tracks, terminals, and facilities of railroads engaged in interstate commerce, in and under the jurisdiction of the Interstate Commerce Commission."

This was the question to be decided. It appears that the opinion disregards many of the provisions of the Act, and contrary declarations of the United States Supreme Court. To support this ruling are certain citations, which do not seem to me to support it. The first is *Akron, etc., R. R. v. U. S.,* 43 Sup. Ct., 270; 67 L. Ed —. Referring to it, the opinion says:

"Illustrative of the universality of supervision and control of carriers by the Interstate Commerce Commission, the Court cites: The establishment of railroad labor and adjustment boards; the raising of capital by new government loans," etc.

The language quoted was doubtless an inadvertence. No question of State power was involved in that case. Examination of that case will show that the provisions referred to (in a footnote) were cited by Judge Brandeis, not as

"illustrative of the universality of the supervision and control of carriers by the Interstate Commerce Commission," but rather as indicating the variety of provisions contained in the Act, designated for the purpose of insuring an adequate transportation service. It seems obvious that the Supreme Court would not cite the provision establishing the labor board as illustrating "universality of * * * control * * * by the Interstate Commerce Commission." I am unable to see that the case is in any wise relevant.

The next citation is the Wisconsin Rate Case. It has reference to the new departure in the provisions of the Act, whereby the Federal Commission is required to fix rates, with a view to obtaining a prescribed aggregate return. The case, in language already quoted, denies that the Transportation Act, as construed, vests the Federal Commission with "universality of supervision and control," or "unified control," to use the language of Chief Justice Taft. So the Wisconsin opinion would seem to controvert, instead of support, the ruling which has been made in this case.

After the Wisconsin Case, the opinion quotes from Paragraph 18, § 1, amended Interstate Commerce Act (U. S. Comp. St. Ann. Supp., 1923, § 8563 [18]), language forbidding the extension by any carrier "of its line of railroad" without a certificate of convenience and necessity from the Federal Commission, followed by this paragraph : "The term 'railroad,' as used in the Act of 1920" (paragraph 3, § 1, amended Act), is defined as including— "all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein including all freight depots, yards, and grounds used, or necessary in the transportation or delivery of any such property."

The significance of this reference is difficult to discover. Certainly this case as to a shed cannot be held to. be one of "extension of its line of railroad."

Following the quotations from the statute, the opinion refers to the Los Angeles Union Station Case, and quotes therefrom the following:

"The foregoing excerpts from among the many provisions of said amendatory Act would seem to fully justify the statement of Chief Justice Taft, above quoted from the decision of the Supreme Court of the United States, as to the radical departure effected by the said amendment to the Interstate Commerce Act in the direction of placing the entire control over the rates, properties, track, terminals, and the facilities of the railroads engaged in interstate commerce in and under the jurisdiction of the Interstate Commerce Commission."

And the opinion proceeds:

"If, therefore, Congress has committed to the Interstate Commerce Commission the supervision, control, and direction of railroad facilities of every nature, the field has been occupied, to the exclusion of State regulation."

But it must be noted that the language quoted from the California opinion was upon a different state of facts. It was as to "Changes and extensions of the railroad lines"; and in the concluding paragraphs of the opinion the power of the California Commission to require grade crossing elimination appears to be clearly recognized. The California opinion does not involve a discussion of Paragraph 17 of Section 1 (Section 8563 [17]); and, as heretofore noted, the opinion is under appeal.

Then follow *Gibbons v. Ogden,* 9 Wheat., 1; 6 L. Ed., 23, and the Minnesota Rate Cases, 230 U. S., 352; 33 Sup. Ct. 729; 57 L. Ed., 1511; 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18, quoting language expressive of the paramountcy of Federal power to the extent that it may be necessary to be exercised for the effective regulation of

interstate commerce. Those opinions, and the language quoted from them, relate to the extent of the power of Congress, and not to the extent to which Congress has sought to exercise that power; hence, it would seem, are irrelevant to the point involved in the ruling. The opinion also refers to *N. Y. Central R. R. v. Public Service Commission,* 233 N. Y., 113; 135 N. E., 195; 22 A. L. R., 1073. This opinion was rested entirely upon the proposition that Congress, having exercised (Paragraph 3, § 1), regulatory power with respect to facilities for interchange of traffic, the States were necessarily ousted of their jurisdiction. Paragraph 17 of Section 1 is not referred to in that opinion.

After a complimentary reference back to the California case, the opinion proceeds with a discussion of the effect of Section 15a, which is treated as "conclusive of the purpose of the Act to control the matter of nonproductive additional facilities and terminals"; whereby all regulation by the State is interdicted. The word "nonproductive" is unimportant. Obviously, whatever property is necessary to enable a carrier to function, which is so used, is productive property. It is impossible to see how the facilities ordered here are less productive than stations or cars.

The opinion, having referred to the fixation of the percentage of return on March 1, 1922, by the Federal Commission, proceeds as follows:

"We may conceive an instance of a carrier operating upon a negligible net operating income and making application to the Interstate Commerce Commission for an increase of rates; its statement shows the value of its property to be so much, and its net operating income to be below 6 per cent. of the aggregate value of its property. If such statement be accepted as true, and it appears that the management has been honest, efficient, and economical, and the expenditures for maintenance of way, structures, and equipment reasonable, the Interstate Commerce Commission

will be justified in allowing the increase of rates sufficient to insure the 'fair return.' But of all these matters the Interstate Commerce Commission must be satisfied, and it is their duty to determine them. They are no more obligated to accept the dictum of a State Legislature that certain additions, betterments, or equipment are reasonable, than that the management has been honest, efficient, and economical, or that the property is of a certain value."

This paragraph appears to me to involve a double error. It seems to be assumed that Section 15a fixes a standard for the measurement of the reasonableness of the rates of particular carriers, and that any single carrier makes a case for rate increases by showing that it is not earning upon its value the "fair return" prescribed by the Commission under Section 15a and that its management is honest, efficient, and economical, and that its expenditures for maintenance have not been excessive. But a careful study of the Act will show that this is not the situation. Section 15a provides for an aggregate value, and for the measurement of the sufficiency of rates generally upon all roads by the aggregate return upon such aggregate value yielded from the operations of all. The group plan of rate making presupposes that some roads will earn more upon their value than the percentage fixed as a fair return, and that others will earn less. The Commission is commanded to adjust rates so as to make the aggregate "as nearly as may be" equal to the fair return percentage. Obviously, if it attempted to put all the small earning roads on such a percentage individually, the aggregate would naturally be much more than the percentage aggregate aimed at by Section 15a.

The other apparently wrong idea involved in the paragraph of the opinion just quoted is in the assumption that the Federal Commission may omit carrier property in use for transportation purposes when fixing aggregate value, if it considers its acquisition and devotion to carrier

purposes unreasonable.    It has no such option.    The aggregate value of all roads within a group is made up of the value of the. individual roads, fixed under the provisions of Section 19a (U. S. Comp. St. Ann. Supp., 1923, § 8591). This is provided in Paragraph 4 of Section 15a.    What is to be considered by the Commission in fixing such aggregate value is not a matter of discretion with it, but its duty is mandatory.    In Paragraph 2 of 15a it is provided that the return which the. Commission is to permit to be earned shall be—

"a fair return upon the aggregate value of the railway property .of such carriers held for and used in the service of transportation."

In Section 19a, par. (a), it is provided that the Commission. shall "ascertain, and report the value of all the property owned or used"; and in Paragraph (b) of the same section it is provided that it shall—

"report in detail as to each piece. of property owned or used by said [each] common carrier for its purposes as a common carrier."

The data provided for in said Paragraph (b) constitute the evidence from which the Commission draws its conclusion of the. value of the property.    Paragraph (f) of Section 19a, further provides that, after the value of the property of a carrier is once made—

"the Commission shall thereafter in like manner keep itself informed of all extensions and improvements or other changes in the condition and value of  *  *  *  from time to time, revise and correct its valuations."

It will thus be seen that, under the express provisions of the law, the Federal Commission must value all the property devoted by a carrier to the purposes of transportation, including all improvements, and may not reject any because it is of the opinion that some ought not to have been required or voluntarily made.

The opinion then proceeds with a discussion concerning the accounting requirements of the Federal Commission.

The unquestioned fact is stated that, under the Commission's accounting system, "improvements, betterments, and equipment are chargeable to capital account." But much that is said in the opinion must arise from an unusual view of the Commission's power as to accounts and as to its accounting requirements, and its practices wtih respect thereto. The Commission's power as to accounts goes only to the prescribing of proper, and the requiring of proper, reports. It is the duty of carriers to keep their accounts and to make reports as required by the Commission. The Commission may inspect carrier's accounts to see that they are kept in accordance with the forms prescribed by it. Paragraph 5, § 20, amended Act (U. S. Comp. St. Ann. Supp., 1923, § 8592[5]). This is the limit of the Commission's power as to accounts. This is the limit of the Commission's power. The Commission cannot arbitrarily say that expenditures for station sheds (unquestionably "improvements or betterments") shall be charged to operation, or not charged to any account. It not only will not attempt to say that, but it has no power under the Act to say it.

In the opinion then comes this statement:

"Expenditures for additions and betterments   *   *   * cannot be charged to capital account without the sanction of their reasonableness and public necessity by the Interstate Commerce Commission."

Not only is there nothing in the Act which gives the Commission the power to exclude expenditures made from their proper accounts, but the accounting regulations of the Commission will show that there is no attempt to subject carriers to the supervision of the Commission as to the propriety or necessity of the expenditures. It is mandatory on the Commission to value all property "held for and used in the service of transportation." Paragraph 2, § 15a. Mention is also made in the opinion of the use of the words "honest, efficient, and economical" management in Paragraph 3 of Section 15a. But they are there used by

Congress in stating facts which the Commission is commanded to consider in determining how large the percentage of return fixed by it shall be. It is to consider the transportation needs of the country, and such necessity as it may find for enlargement of existing transportation facilities, if such are conducted "under honest, efficient, and economical management."

It is impossible to see that either of the provisions just referred to can in any way have relation to the disposition to be made in the carrier's accounts of expenditures involved in complying with the order in question, or with the right of the carrier, having made compliance, to have the resulting addition to property considered in the fixing of its value, and in the fixing of the aggregate value of the property of all carriers in its group.

The suggestion is also made that, if the improvements ordered are made, and the Southern tries to borrow money from the general railroad contingent fund to pay for them, the Federal Commission will not make the loan unless it approves the expenditure. I am not able to see the relevancy of this suggestion. Certainly state power to require improvements in facilities necessary for intrastate transportation is not to be measured by the extent to which the Federal Government has provided for loans to carriers with which to pay for such improvements.

The remainder of the opinion is to the effect that state requirements as to expenditures must affect either the values upon which a return from operation is to be earned under Section 15a, or the net remaining from operation, and hence must affect the burden upon interstate commerce, and result, if allowed, in breaking down the congressional scheme of rate making.

This argument necessarily goes equally well to the interdiction of State regulations requiring expenditures for operation as to regulations requiring capital expenditures. A state cannot make any law or commission order requir-

ing a carrier to do anything in the way of improving its facilities or service without requiring it to expend money. If the argument is sound, a state Commission may no longer make any effective order. But the United States Supreme Court (in language quoted from the Wisconsin Rate Case) has said that the Transportation Act does not affect, "general regulations of intrastate commerce." Such regulations remain with the State.

So much upon the intent of the Transportation Act. If this opinion shows that there was no intent upon the part of Congress to destroy State power to make such orders as that involved in this case, there is no occasion to consider the extent of the power of Congress, nevertheless it will be well to refer to certain constitutional considerations which would appear to forbid such a construction as has been placed upon the Act by this Court. There is a line, difficult of demarcation, but undoubtedly existent, beyond which Congress may not go under the commerce clause of the Constitution, in restraining regulation of intrastate commerce by the states. In *Louisville, etc., Ry. v. Mississippi,* 133 U. S., 587; 10 Sup. Ct., 348; 33 L. Ed., 784, the validity of a state statute requiring separate facilities for passengers of different races was under consideration. At page 591, of 133 U. S., at page 349 of 10 Sup. Ct. (33 L. Ed., 784), the Court said:

"So far, therefore, as this class of transportation [intrastate] as an element of commerce, is affected by the statute under consideration, it is not subject to the constitutional provision concerning commerce among the states It has often been held in this Court, and there can be no doubt about it, that there is a commerce wholly within the state, which is not subject to the constitutional provision, and the distinction between commerce among the states and the other class of commerce between the citizens of a single state, and conducted within its limits exclusively, is one which has been fully recognized in this Court, although it

may not be always easy, where the lines of these classes approach each other, to distinguish between the one and the other."

The point of. this citation is this: Such a statute requires on the part of carriers expenditures both for capital and for operating purposes. If the decision so far made by our Court is sound, such statutes have become ineffective, because the expenditures would increase the property value, and decrease the net earnings of interstate carriers and interfere with the purpose (as construed by this Court) of Section 15a. But the constitutionl rights of a State may not be taken away by Congress. In one of the cases it is said that there is—

"equal necessity, under our system of government, to preserve the power of the States within their sovereignties as to prevent the power from intrusive exercise within the national sovereignty.  *  *  * "

In the opinion already filed in this case is the following:

"Under the section of the South Carolina Code, claimed by the petitioners as their authority for ordering the improvements,  *  *  *  they could order new and elaborate station houses at every point in the State; the abolition of every grade crossing, and any other improvement, betterment, or additional equipment that might be suggested, without regard to the condition of the carrier, or of the. effect upon its ability to provide adequate transportation after such expenditures may have been made. 'No man can serve two Masters.' "

But the conclusion of the Court that because the state might misuse its power of regulation, the power does not exist, is not consistent with the declaration of the United States Supreme Court in the Erie R. R. Case, 254 U. S., 394; 41 Sup. Ct., 394; 65 L. Ed., 322. That was a case as to a grade crossing. The point made was that it would burden interstate commerce and impair the ability of the railroad to perform its transportation functions. In an

opinion by Mr. Justice Holmes, this point was summarily disposed of as follows:

"Grade crossings call for a necessary adjustment of two conflicting interests * * * being places to which the public is invited and that it necessarily frequents, the state, in the care of which this interest is, and from which ultimately the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. This is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossings of the road it would soon be bankrupt. That the states might be so foolish as to kill a goose that lays golden eggs for them has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil."

The opinion of Mr. Justice Cothran ends by incorporating a hypothetical statement quoted from respondent's argument. I should rather adopt the last above quoted statement, written by the hand of the learned descendant of the world-famed author of "The Autocrat of the Breakfast Table."

In concluding, it would be well to revert to Paragraph 17, § 1, of the said Act, wherein Congress declared that nothing in this Act should impair or affect the right of a state, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission, made under the

provisions of the Act; and again to the famous "Jim Crow" Case urged by the Attorney General in his supplementary brief, page 14, in the language of Mr. Justice Brewer, as follows:

"So far as the first section is concerned (and with that alone we have to do), its provisions are fully complied with when to trains within the state, is attached a separate car for colored passengers. This may cause, an extra expense to the railroad company; but not more so than state statutes requiring certain accommodations at depots, compelling trains to stop at crossings, and a multitude of other matters confessedly within the, power of the State."

So, as it is submitted by the Attorney General, that not only a "Jim Crow" car regulation, but separate waiting room regulations for the two races, the, Cinder-Finder Act (Civ. Code, 1922, § 4950), and many other state statutes, would all necessarily and automatically become obsolete, under the construction of the act, as contended for by respondent, if adopted.

Also we should bear in mind the general rule of construction, that where an act permits of two constructions, one of which will lead to constitutional difficulties, and the other will render the act valid, the Court should adopt the latter.

Article 9 of the Amendments of the United States Constitution provides that the renunciation in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people. And Article 10 of the Amendments provides that the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states.

Upon the testimony taken by the referee, under the, order of this Court, I find that the petitioners' witnesses have made out a clear case; and the testimony of the respondent's witnesses is evasive, and goes mainly upon an irrelevant question as to the health and habits of the people of Blackville in going about their own premises.

I would rather accept the direct testimony of Edgar A. Brown, Esq., and A. H. Ninestein, Esq., members of this bar, and well known to the Court; and I can see no reason why sheds should be erected at points where a few tourists transfer and not at Blackville where the traffic is principally intrastate. As Mr. Brown says, when questioned on that point: "I do not know that tourists' travel is entitled to more protection than Barnwell County."

I would certainly answer the questions, sent to reference by this Court, and find: That the cost of erecting the shed is inconsiderable; that it is necessary to erect such shed in order to protect the health of the traveling public from the inclemency of the weather at the station in question; that it is necessary for the convenience of the traveling public that the said shed should be erected; that the use of the trains passing said station is largely by intrastate passengers.

I think the petition should be sustained, and the mandamus issued.

Messrs. Johnson, Townsend and Shipp, Circuit Judges, concur.

Mr. Townsend, Circuit Judge (concurring): This matter is before us on a petition by the Railroad Commission of South Carolina, for mandamus, to compel compliance by the Southern Railway Company with an order of the Commission, dated March 14, 1923, requiring said company to construct certain passenger sheds at Blackville, S. C., a station on its line. There has been no order made by the Interstate Commerce Commission with reference to the erection of such sheds. The evidence has been taken and reported by the special referee; and from such evidence it appears that the erection of such sheds is desirable as a protection to the health of passengers boarding, or leaving, or changing, cars at this station. The cost of the erection of such sheds as are ordered is $800, or of better sheds preferred by the respondent is $1,600.

Blackville is one of the oldest, and more important, stations on the original line of the old South Carolina Railroad, built over 80 years ago, then the longest railroad in the United States, extending from Charleston, through Aiken, S. C., to Augusta, Ga., where connections were later made with railroads toward the west. For the first 45 of these years, Judges and other traveling men, attending the Courts, or having business in Barnwell village, left and took the cars at Blackville—making the 10-mile trip to Barnwell in a hack, over a sandy road, in two hours, as did others from beyond the Edisto River, attending the markets in Augusta or Charleston, or on calls of business or pleasure at way stations. About 1881 Whilden Woodward built the Barnwell Railroad (now, like the old South Carolina, owned and operated by the respondent), affording rail connection between Barnwell and Blackville, and putting Jim Roby's hack line out of business. In the 70's the Port Royal Railroad, now the Charleston & Western Carolina, had been built from Port Royal, S. C., via, Allendale, S. C., 17 miles south of Barnwell, to Augusta, Ga., crossing the Charleston & Savannah Railroad (now owned and operated by the Atlantic Coast Line Railroad Company) at Yemassee, opening up a rival rail route between Augusta and Charleston, and making Savannah accessible as a new market for this territory.

About 1890, the South Bound Railroad, now owned and operated by the Seaboard Air Line Railway, was built from Columbia to Savannah, crossing the old South Carolina Railroad at Denmark, then known as Graham's Station, 9 miles east of Blackville. It was originally proposed to make the Barnwell railroad a link in the South Bound, but its then owners demanded what the projectors of the South Bound thought an exorbitant price, so they built their line to parallel the Barnwell road. Upon this being done, the owners of the Barnwell Railroad extended that road to connect with the Charleston & Western Carolina at Allen-

dale on the south, and for some 20 miles to Wagener, in the direction of Batesburg on the north, and did a magnificent business, getting competitive rates over the South Carolina & Georgia Railroad at Blackville, and the Charleston & Western Carolina at Allendale, between all points on the Barnwell road, then known as the Carolina Midland, and the cities of Charleston, Augusta, and Savannah. Then, about 1900, the Southern Railway Company acquired ownership and control of both the South Carolina & Georgia, and the Carolina Midland Railroads, and in order to compete with the Seaboard Air Line Railway, for the traffic between Florida and the north, constructed a short line between Cayce and Perry, on the Carolina Midland, and extended the latter road from Allendale to Hardeeville, on the Charleston and Savannah Railroad, thus forming its present line from Columbia through Blackville to Savannah, over which it attempted for a few years to operate one or two through passenger trains in competition with the Seaboard Air Line Railway for passenger traffic between Florida and the north. This competition has been abandoned, and the respondent is now operating through trains from the west to Columbia, where they turn over the Pullmans to the Seaboard for transportation over the old South Bound for Jacksonville and points to the south through Savannah. Only one passenger train each way daily is now operated by respondent over its line between Columbia and Savannah (see schedule, Exhibit M, opposite page 50 of case), and one other between Columbia and Allendale only. The train from Savannah connects with a northbound train of the Southern at Columbia. Both trains passing Blackville on the line between Allendale and Columbia connect with trains between Charleston, or Branchville, and Augusta (see schedules, Exhibits L and M). The number of passengers so transferring at Blackville from one line to the other is not definitely shown by the evidence—nor the exact proportion between intrastate and interstate passen-

gers. The Chief Engineer of the respondent when asked, answered: "I have no figures on that." The superintendent of respondent testified:

"Both lines are used to a considerable extent for interstate travel. A preponderance of the business is interstate; I wouldn't say passenger, but freight. Of course, it is used for both."

He testified to the sale of passenger tickets at Blackville, and says:

"The intrastate tickets amounted in value to $12,200; while the interstate tickets (which we may reasonably assume were for longer distances and larger items) were $5,200."

He added:

"We have no figures on passengers boarding the trains at way stations between Branchville and Aiken, and going to way stations on the other line."

The respondent's Chief Engineer testified ·

"The record of ticket sales is kept for individual stations, and the only way you could get a record of passengers from other points would be to investigate the station account of every station on the system. * * * It would be impracticable to keep such a record for any particular transfer point. They would have a record that would show interstate as distinct from intrastate at any particular station, and Mr. Hudson gave such a figure for the sale of tickets from Blackville."

Such records were probably used by the company in making up its annual report to the Railroad Commission for the year ending December 31, 1922, sworn to May 1, 1923, which states that the revenues earned by respondent from the operation of all its lines within this State, during that year were from passenger traffic, $4,201,638.84, divided into intrastate passenger traffic, $1,733,158.74, and interstate passenger traffic $2,468,480.10; and that the revenues earned by it within this State, from freight traffic was

$13,266,507.15, divided into intrastate freight traffic, $2,329,446.90, and interstate freight traffic, $10,937,060.25. These figures are to be found in the annual report of the State Railroad Commission for the year 1923.

The evidence, without any reference to the above report, which corroborates it, shows as a necessary inference that the greater number of passengers boarding, leaving, and transferring between trains on the lines of respondent's railroads at Blackville are intrastate passengers, and that the sheds ordered erected are reasonably necessary for the protection of their health, and that the cost of their erection, and expense thereby added in the operation, maintenance, or capital account of the railroad is so small in comparison with its revenues from intrastate traffic in this State as not to constitute a direct or undue burden upon interstate commerce.

As to the objection, that the Federal Transportation Act of 1920 (41 U. S. Stats. L., 456; Fed. Stats. Ann., 1920, p. 98) deprives the State Railroad Commission of jurisdiction to make the order, sought to be enforced, we must remember the admonition of Mr. Justice Holmes, in *Brown v. Walker,* 161 U. S., 591; 16 Sup. Ct., 644; 40 L. Ed., 819:

"Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine."

Therefore the Transportation Act, § 402 subd., 17 (U. S. Comp. St. Ann. Supp., 1923, § 8563[17]), provides:

"Nothing in this Act shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this Act."

This provision is intended to guard the reserved rights of the states over intrastate commerce, and is no more em-

barrassing to the national administration of interstate commerce than the admitted rights of the states to prescribe intrastate rates, which do not discriminate against, nor burden, interstate commerce.

The Federal Transportation Act should not be construed to prevent the state from exercising its police power to require adequate local facilities for intrastate passenger traffic, reasonably necessary for the protection of the health of the passengers (N. Y., etc., *R. R. Co. v. N. Y.,* 165 U. S., 628; 17 Sup. Ct., 418; 41 L. Ed., 853. *Barrett v. N. Y.,* 232 U. S., 14; 34 Sup. Ct., 203; 58 L. Ed., 483), in accordance with the principles laid down in *Chicago, B. & Q. Ry. Co. v. Wis. R. R. Comm.,* 237 U. S., 220, 226; 35 Sup. Ct., 560; 59 L. Ed., 926. *St. Louis & San Francisco R. R. Co. v. Public Service Com.,* 254 U. S., 535; 41 Sup. Ct., 192; 65 L. Ed., 389; and later case, with same title, in 43 Sup. Ct., 381; 67 L. Ed. ——. See opinion of the North Carolina Court in *North Carolina Corp. Com v. So. Ry. Co.,* 117 S. E., 563.

For these reasons above stated, I concur in the opinion announced by the Chief Justice, and of Circuit Judge Memminger.

MESSRS. JOHNSON, MEMMINGER and SHIPP, Circuit Circuit Judges, concur.

MR. JUSTICE COTHRAN (dissenting) : Petition for mandamus, in the original jurisdiction of this Court, by the Railroad Commission of South Carolina, to compel compliance by Southern Railway Company with an order of the Commission, dated March 14, 1923, requiring said company to construct certain station sheds at Blackville, S. C., a station on its line.

After due notice to the railway company, the matter was heard by the Railroad Commission on January 17, 1923, and on March 14, 1923, the Commission passed an order reciting that—

"As Blackville is a junctional point and a station where passengers must transfer from one train to another, the Commission is convinced that it is necessary to have additional facilities at this point," and requiring the Company "to construct the usual station sheds, commencing at the eastern end of the present depot and extending east, or in the direction of Branchville, for a distance of fifty (50) feet; and the same kind of shed, commencing at the southern end of the present depot and extending south towards Savannah for a distance of fifty (50) feet," within 20 days from the date of the order.

The railway company having failed to comply with said order, the Commission, on April 30, 1923, filed its petition in this Court asking for a mandamus to compel compliance, and obtained from the Chief Justice an order, dated May 5, 1923, requiring the Southern Railway to show cause before the Court on June 11, 1923, why the mandamus prayed for should not be issued.

The Railway Company made return to said order of the Chief Justice, admitting, substantially, the facts alleged in the petition, and specifically urging the following objections to the order of the Railroad Commission:

"That the lines of the railway company here in question compose a part of the Southern Railway System, which is an interstate railroad, and that the lines here in question are used for interstate travel and freight from the City of Charleston to the City of Augusta and other points beyond the said Cities of Charleston and Augusta, and a line extending from the State of Georgia to Columbia, Charlotte, Spartanburg, Asheville, Greenville, Atlanta, and other points, from which interstate traffic and transportation revenues are largely composed, and that by reason of the laws of the Federal Government with regard thereto, the Railroad Commission of South Carolina is without jurisdiction to order improvements of the nature and kind pro-

vided in the order here in question, and the same is therefore null and void."

And that—

"This Court is without jurisdiction to render an order herein requiring compliance with the order of the Railroad Commission, and the same constitutes taking of property without due process of law, in violation of Article 5 of the Constitution of the United States."

The matter was then heard by this Court, practically submitted, upon the petition, order, return and printed arguments.

The Railroad Commission founds its claim for authority to pass the order in question upon Section 4821, Vol. 3, Code of Laws A. D. 1922 (Sestion 3147, Vol. 1, Code of Laws A. D. 1912, amended by 31 Stat., 1086), which is as follows:

"Whenever, in the judgment of the Railroad Commissioners, it shall appear that repairs are necessary upon any such railroad, or that any addition to the rolling stock, or any enlargement of, or improvement in, the stations or station houses, or any modification in the rates of fare, for transporting freight or passengers, or any change in the mode of operating the road and conducting its business, is reasonable and expedient in order to promote the security, convenience and accommodation of the public, they shall give information in writing, to the corporation of the improvements and changes which they adjudge to be proper; and if the said company shall fail, within sixty days, to adopt the suggestions of said Commissioners, they shall take legal proceedings as they may deem expedient, and shall have authority to call upon the Attorney General to institute and conduct such proceedings: Provided, that the powers herein conferred upon the Railroad Commission of South Carolina shall be sufficient to require of common carriers the establishment and maintenance of such terminal facilities, extension of pass tracks, sidetracks, other than in-

dustrial tracks, and all other improvements and changes which seem reasonable and expedient to the said Railroad Commission."

If it were not for the Act of Congress, referred to as the "Transportation Act of 1920," there would be ample authority in the decisions of this Court to sustain the Commission's order. *Bonham v. R. Co.,* 26 S. C., 353; 2 S. E., 127. *R. R. Commission v. R. Co.,* 82 S. C., 418; 64 S. E., 240. *R. R. Commission v. R. Co.,* 74 S. C., 80; 54 S. E., 224.

All of these cases, however, were decided prior to the Transportation Act of 1920, and throw no light at all upon the question now presented—the effect of that Act upon state regulation of such matters as are here involved.

The Transportation Act of 1920 effected a radical departure, and introduced into Federal Legislation a new railroad policy. It has placed the entire control over rates, properties, tracks, terminals, and facilities of railroads engaged in interstate commerce, in and under the jurisdiction of the Interstate Commerce Commission.

In *Akron, etc., R. Co. v. U. S.,* 43 Sup. Ct., 270; 67 L. Ed. —, opinion filed February 9, 1923, the Court says:

"Transportation Act 1920 introduced into the Federal Legislation a new railroad policy"—citing *R. R. Comm. v. C. B. & Q. R. Co.,* 257 U. S., 563; 22 A. L. R., 1086.

The "new policy," as contrasted with the old, was thus expressed:

"Theretofore, the effort of Congress had been directed mainly to the prevention of abuses, particularly those arising from excessive or discriminatory rates. The 1920 Act sought to insure, also, adequate transportation service."

And the sustaining quotations from the Act were quoted:

"To enable the carriers 'properly to meet the transportation needs of the public,' * * * to give due consideration to 'the transportation needs of the country, and the necessity * * * of enlarging facilities,' to 'best meet

the emergency and serve the public interest,' * * * to 'best promote. the service in the interest of the public and the commerce of the people'; * * * 'that the public interest will be promoted.' "

Illustrative of the universality of supervision and control of carriers by the Interstate Commerce Commission, the Court cites: The establishment of railroad labor and adjustment boards; the raising of capital by new government loans; loans from the general railroad contingent fund; placing of the issuing of new securities under control of the Commission; the consolidation of railroads into a limited number of systems; provisions for securing adequate car service; joint use of terminals; interchange of traffic.

In the Wisconsin Rate Cases, 257 U. S., 563; 42 Sup. Ct., 232; 66 L. Ed., 371, 22 A. L. R. 1086, the Court, through the Chief Justice, says:

"It is manifest from this very condensed recital that the Act made. a new departure. Theretofore the control which Congress, through the Interstate Commerce Commission exercised was primarily for the purpose of preventing injustice by unreasonable or discriminatory rates against persons and localities, and the only provisions of the law that inured to the benefit of the carriers were the requirement that the rates should be reasonable in the sense of furnishing an adequate compensation for the particular service rendered and the. abolition of rebates. The new measure imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States. This is expressly declared in Section 15a to be one of the purposes of the bill."

Touching the purpose and effect of the Transportation Act of 1920, the report of the Senate Committee on Interstate Commerce contains this statement:

"Heretofore the regulation of transportation has been regarded merely as a restriction imposed upon particular

carriers. For the first time it is proposed to look upon transportation as a subject of national concern and from a national standpoint. It is the duty of the government so to exercise its power of regulating commerce   *   *   * that all parts of a common country shall enjoy adequate transportation facilities at the lowest cost consistent with fairness to the capital invested and to the men who manage and operate these facilities. The commerce of one community, in these days, is deeply involved in the commerce of every community in the land."

Subdivision 18 of Section 1 of the Interstate Commerce Act, as amended by the Transportation Act of 1920 (U. S. Comp. St. Ann. Supp., 1923, § 8563 [18]), provides:

"After ninety days after this paragraph takes effect no carrier by railroad subject to this Act shall undertake the extension of its line of railroad   *   *   * until there shall have first been obtained from the Commission a certificate that the present or future public convenience and necessity require   *   *   * the construction,   *   *   * of such additional   *   *   * line of railroad."

The term "railroad," as used in the Act of 1920, is defined as including—

"All the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein including all freight depots, yards, and grounds used, or necessary in the transportation or delivery of any such property."

In *Atchison, etc., R. Co. v. R. R. Commission* (Cal. Sup.) 211 Pac., 460, it is said:

"In the matter of the extension of railroad facilities and in the abandonment of other railroad facilities, including terminals, not only is the Commission empowered to act upon the subject, but Congress has expressly prohibited the

railroad companies from acting without the consent of the Interstate Commerce Commission"—citing subdivision 18 above quoted.

Not perhaps directly applicable to the matter in hand but as indicating a definite purpose that the Interstate Commerce Commission should have supervision of all facilities of carriers, subdivision 3, of section 3 of the Interstate Commerce Act, as amended by the Transportation Act of 1920 (U. S. Comp. St. Ann. Supp., 1923, § 8565 [31]), provides:

"All carriers, engaged in the transportation of passengers or property, subject to the provisions of this Act, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper."

"The foregoing excerpts from among the many provisions of said amendatory Act would seem to fully justify the statement of Chief Justice Taft, above quoted from the decision of the Supreme Court of the United States, as to the radical departure effected by the said amendment to the Interstate Commerce Act in the direction of placing the entire control over the rates, properties, track, terminals, and facilities of the railroads engaged in interstate commerce in and under the jurisdiction of the Interstate Commerce Commission." *Atchison, etc., R. Co. v. R. R. Commission* (Cal. Sup.), 211 Pac., 460.

If, therefore, Congress has committed to the Interstate Commerce Commission the supervision, control, and direction of railroad facilities of every nature, the field has been occupied, to the exclusion of state regulation.

In the early leading case of *Gibbons v. Ogden,* 9 Wheat., 1; 6 L. Ed., 23, Chief Justice Marshall carved out the pathway for all later decisions, by the declaration that the power of Congress to regulate commerce between the several states is supreme and plenary, "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." See, also, Minnesota Rate Case, 230 U. S., 399; 33 Sup. Ct., 729; 57 L. Ed., 1511; 48 L. R. A. (N. S.), 1151; Ann. Cas., 1916A, 18.

In the Minnesota Rate Case, 230 U. S., 352; 32 Sup. Ct., 739; 57 L. Ed., 1511; 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18, the Court said:

"The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the State, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

Whenever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress and not the State that is entitled to prescribe the first and dominant rule; for otherwise Congress would be denied the exercise of its constitutional authority, and the State, and not the nation, would be supreme in the national field. *Houston, etc., R. Co. v. U. S.,* 234 U. S., 342; 34 Sup. Ct., 833; 58 L. Ed., 1341.

The question which arose in the case of *People ex rel. New York, etc., R. Co. v. Public Service Commission,* 233 N. Y., 113; 135 N. E., 195; 22 A. L. R., 1073, was whether or not the Public Service Commission of New York had the power to make an order directing two railroad companies engaged in interstate and intrastate commerce within the State, to construct a switch or track connecting their lines and install other tracks and facilities so as to furnish adequate and convenient interchange of freight between said railroads.   The Court held that the State Commission had no jurisdiction to make such order in view of the Transportation Act of 1920, amending the Interstate Commerce Act, which pre-empted the legislative field in favor of the Interstate Commerce Commission.

"To sustain the order of the Public Service Commission in the instant case would necessarily establish that the two several Commissions mentioned were clothed with jurisdiction to grant the relief sought and require us to ignore the well-established principle of law that the Congress having delegated to the Interstate Commerce Commission power to deal with the subjectmatter of this proceeding, an exercise of like power by the State is thereby superseded"—citing *Erie R. R. v. People,* 233 U. S., 671; 34 Sup. Ct., 756; 58 L. Ed., 1149; 52 L. R. A. (N. S.), 266; Ann. Cas., 1915D, 138.   *Chicago, etc., R. Co. v. Hardwick,* 226 U. S., 426; 33 Sup. Ct., 174; 57 L. Ed., 284; 46 L. R. A. (N. S.), 203.

In *Atchison, etc., R. Co. v. R. R. Commission* (Cal. Sup.), 211 Pac., 460, the main question involved and discussed was whether or not the Railroad Commission of California had the power to order three separate railroad companies, whose lines entered Los Angeles, each of which was engaged in both classes of commerce, to establish a union terminal depot within a certain defined area.   The Court, in an exceedingly elaborate and able opinion, unanimously held that, in view of the Transportation Act of 1920, the power did not exist.   It was held that in the matter of the extension of

railroad facilities, not only is the. Interstate Commerce Commission empowered to act on the subject, but that Congress has expressly prohibited the railroad companies from acting without the consent of the Interstate. Commerce Commission under penalty.   It is impossible to present extracts from the opinion of the Court which would do justice to its clarity and unanswerable logic.

Another consideration is conclusive of the purpose of the Act to control the matter of nonproductive, additional facilities and terminals, and, having pre-empted this field, all regulation by the states is interdicted.   This matter is not only subjected to the control of the Interstate Commerce Commission, but it is so interrelated with the purpose of the Act in supervising transportation facilities and in fixing rates, that interference by the states therewith necessarily affects interstate commerce.

Section 15a of the Act makes it the. duty of the Interstate Commerce Commission, in the exercise of its rate-making authority, to prescribe such rates as will give the carrier a fair return upon the aggregate value of the railroad properties used in the service of transportation.   The pertinent provisions .of the section are as follows:

"In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole. (or as a whole in each of such rate groups or territories as the Commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income. equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation."

The section also provides (subdivision 3):

"The Commission shall from time to time. determine and make public what percentage of such aggregate property

value constitutes a fair return thereon, and such percentage. shall be uniform for all rate groups or territories which may be designated by the Commission. In making such determination it shall give due consideration, among other things, to the transportation needs of the country and the necessity (under honest, efficient and economical management of existing transportation facilities) of enlarging such facilities in order to provide the people of the United States with adequate transportation: Provided, that during the two years beginning March 1, 1920, the Commission shall take as such fair return a sum equal to $5\frac{1}{2}$ per centum of such aggregate value, but may, in its discretion, add thereto a sum not exceeding one-half of one per centum of such aggregate value to make provision in whole or in part for improvements, betterments or equipment, which, according to the accounting system prescribed by the Commission, are chargeable to capital account."

"After the expiration of March 1, 1922," the two-year period above mentioned, the Interstate Commerce Commission, "after considering all the facts of the record, including the necessity of reasonable expenditure for additions and betterments," found and determined:

"That on and after March 1, 1922, a fair return of the aggregate value * * * will be 5.75 per centum of such aggregate property value as a unifrom percentage of all rate groups or territories designated by this Commission."

The Act specifically provides that in "making such determination," that is, what shall constitute a "fair return" of the aggregate property value of the carrier, the Interstate Commerce Commission shall give due consideration to the transportation needs of the country and the necessity of enlarging such facilities in order to provide adequate transportation; they shall determine whether or not the management of the carrier has been "honest, efficient, and economical," and whether or not the expenditures for maintenance of way, structures, and equipment have been reasonable.

We may conceive an instance of a carrier operating upon a negligible net operating income and making application to the Interstate Commerce Commission for an increase of rates; its statement shows the value of its property to be so much, and its net operating income to be below 6 per cent. of the aggregate value of its property. If such statement be accepted as true, and it appears that the management has been honest, efficient, and economical, and the expenditures for maintenance of way, structures, and equipment reason-able, the Interstate Commerce Commission will be justified in allowing the increase of rates sufficient to insure the "fair return." But of all of these matters the Interstate Com-merce Commission must be satisfied, and it is their duty to determine them. They are no more obligated to accept the dictum of a state Legisalture that certain additions, better-ments, or equipment are reasonable, than that the manage-ment has been honest, efficient, and economical, or that the property is of a certain value.

Under the accounting system prescribed by the Interstate Commerce Commission, as is specifically stated in Subdivi-sion 3 of Section 15a, improvements, betterments, and equipment are chargeable to capital account. Many matters coming within this classification, apparently present a debatable question whether they should be charged to capital account or to operating expenses. It is, manifestly, to the interest of the carriers that they be charged to operating expenses, and thus reduce to a minimum the "net operating income," which is sought to be swelled by the requested increase of rates. The Interstate Commerce Commission may rule that they are not reasonable, although ordered by a state Legislature, and therefore not entitled to enter into the property value, the basis of the proposed increase, and that they are not operating expenses; so that the carrier gets no credit whatever, either in the capital account or operating expenses, for the large outlay. The reasonable-ness of the proposed improvements being a matter for the

determination of the Interstate Commerce Commission, the state's action is necessarily interdicted.  Under the section of the South Carolina Code, claimed by the petitioners as their authority for ordering the improvements, the matter of repairs, enlargement, or improvements in stations or station houses, modifications of rates, passenger and freight, or changes ·in the mode of operating the railroad and conducting its business, are committed absolutely to the judgment of the Railroad Commission as to what they conceive to be reasonable and expedient in order to promote the security, convenience, and accommodation of the public. Under it they could order new and elaborate station houses at every point in the State, the abolition of every grade crossing, and any other improvement, betterment, or additional equipment that might be suggested, without regard to the condition of the carrier, or of the effect upon its ability to provide adequate transportation after such expenditures may have been made.  "No man can serve two masters."

Another consideration:  Subdivisions 5 and 6 of section 15a, provide for what is called the "recapture" feature of the Act.  If any carrier shall receive for any year a net railway operating income in excess of 6 per cent. of the value of the property held and used by it in the service of transportation, one-half of such excess shall be placed by the carrier in a reserve fund established and maintained by the carrier, and the other half shall be paid to the Interstate Commerce Commission for the purpose of establishing a general railway contingent fund.  The reserve fund maintained by the carrier may be drawn upon for the purpose of paying dividends, interest on stock, bonds or other securities, and rent on leased lines, to a certain extent specified. The general railroad contingent fund, in the hands of the Interstate Commerce Commission, is constituted a revolving fund, to be used in the furtherance of the public interest in railway transportation, by making loans to carriers to meet expenditures for capital account, by refunding securities

issued for capital account, or by purchasing equipment and facilities and leasing same to carriers, under regulations detailed in the Act. If the railway company should be compelled to obey the order of the Railroad Commission, in the installation of such improvements as they might direct, it is manifest that its access to the general railroad contingent fund for a loan to meet expenditures for capital account, or to refund securities issued on that account, would be limited to the approval of the Interstate Commerce Commission of the expenditure, specifically provided for in Subdivision 12.

It will be borne in mind that under the accounting regulations of the Interstate Commerce Commission, there is a definite limit in charging expenditures to operating expenses. Expenditures for additions and betterments must be charged to capital account—they cannot be charged to operating expenses, and they cannot be charged to capital account without the sanction of their reasonableness and public necessity by the Interstate Commerce Commission. It follows that if the expenditure should not be approved by the Interstate Commerce Commission as an item in the capital account, but should be allowed as an item in operating expenses, the requirement by the State of such nonproductive additions and betterments will, in effect, reduce the carrier's approach under existing rates to a net railway operating income equivalent to a fair return on the value of the property, reducing also the possibility of excess earnings divisible with the government. It is clear also that, if the carrier should make the expenditure ordered by the state Commission and charge it to capital account without the approval of the Interstate Commerce Commission, they would have something to say about it, for the addition would constitute a new and increased value on which the "fair return" would be calculated, and must be included also in the aggregate value on which the percentage of return is

considered at the subsequent readjustment of rates and aggregate values for the particular rate group.

The Interstate Commerce Commission establishes rate groups, embracing in each group several States and several carriers. With respect to all of the railroads operating within that particular group, there is determined an aggregate fair value of carrier property engaged in that group in the service of transportation. The percentage of return constituting a fair return on the value of the property is already stated. The Commission accordingly authorizes a schedule of rates sufficient, at least in theory, to provide the proper percentage of return on such aggregate value. From gross revenues operating expenses, taxes, and joint facility rentals are deducted. The resulting figure, designated "net railway operating income," is the item considered in determining what percentage of return has, in fact, been realized, and whether there are any excess earnings—and, if so, how much—to be recaptured. Expenditures for additions and betterments are charged to capital account, increasing for the particular carrier the value of the property, with relation to which the percentage of return is measured. But not only that—the added value attending the improvement thus charged to capital account increases the aggregate value of all carrier property engaged in the service of transportation in that entire rate group, necessitating, ultimately, a readjustment that the prescribed percentage of return may be realized on the new and increased aggregate value of property. The direct and unescapable result of that is that all other states and Communities of that rate group bear an uncompensated portion of the burden created by the unrestricted demands of a particular locality that its own desire for public improvements be met; and the burden is imposed on interstate commerce in the same sense that a discriminatory intrastate rate unlawfully burdens interstate traffic.

We quote from the respondent's argument the following very clear statement:

"The X. Y. Z. Railroad operates almost wholly within the State of Virginia. If that carrier were, through State authorities, required to, and did abolish, every grade crossing and improve every depot on its line of road between Alexandria and Richmond, the total expenditures would amount to many millions of dollars. By just the total amount of those expenditures, would there be increased the property value on which it is entitled to a fair return under existing rates, reducing thereby the actual percentage of return realized. There would also be an increase in the aggregate value of the carrier property in that rate group and a necessary readjustment of rates for the group that the carrier might realize the return recognized as a fair return. Thus the burden of these improvements is imposed upon all other communities and States of that rate group, many of them unserved and untouched by the particular carrier—imposed, too, upon the government itself, for, if by the state's authorities the entire income is expended, the government is deprived of any participation in the earnings exceeding 6 per centum, there would be none.

"Let us suppose the case of a carrier which runs through fourteen states, who has pending at this time insistent demands from state commissions, municipalities, and state Legislatures of $19,033,000 for the building and erection of nonrevenue producing additions and betterments; the making of every one of those would add nothing to the revenue-producing power of the plant, but would increase the capital value of the system by that amount, reduce proportionately the percentage of return, increase the aggregate value of carrier property within the particular rate group and necessitate, ultimately, a readjustment of rates that the prescribed return may be realized on the new and increased value of property. The burden will be distributed to other communities in the same rate group, but unserved

by such carrier and unbenefited by the improvements. Further than that, enforcement of the demands arising in and from the one state will tend to precipitate a like situation in the several other states served by such carrier. That will produce two other results: First, serious impairment, if not absolute breaking down, of an important interstate carrier, a unit of the national transportation system with which Congress was dealing when it passed the Transportation Act of 1920. Second, a sharp conflict with the Congressional policy and utter demoralization and destabilization of the whole scheme of rate making, resulting in the complete breaking down and ultimate failure of the Congressional purpose; a purpose founded on a power confided in Congress by the Constitution and by virtue thereof, lawfully exercised. May the state thus set that at naught? May they disregard the policy, the purpose, the necessity of the enactment?"

The effect of the Transportation Act of 1920 is to limit the power of the States over interstate commerce to an exceedingly circumscribed sphere. They have control of purely internal affairs, but that control, in so far as it affects interstate carriers, must be exercised in a manner that does not project the will of the particular state into other states of the Union. *Stone v. F. L. & T. Co.,* 116 U. S., 334; 6 Sup. Ct., 334, 388, 1191; 29 L. Ed., 636.

The judgment of this Court should be that the petition be dismissed.

Messrs. Justices Watts and Marion and Mr. Henry, Circuit Judge, concur.